# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
Filed: November 22, 2024

* * * * * * * * * * * * * * *
| | | |
|---|---|---|
| STEVEN CORWIN, | * | No. 20-491V |
| | * | |
| Petitioner, | * | Special Master Young |
| | * | |
| v. | * | |
| | * | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |

* * * * * * * * * * * * * * *

*Jessi Carin Huff,* Mctlaw, Mercer Island, WA*,* for Petitioner.
*Jennifer Leigh Reynaud*, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION AWARDING DAMAGES[1]

On April 23, 2020, Steven Corwin ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Program" or "Program"). 42 U.S.C. § 300aa-10 to 34 (2018). Petitioner alleged that the influenza ("flu") vaccine he received on October 30, 2018, caused him to develop Guillain-Barré Syndrome ("GBS"), a Table injury. Pet., ECF No. 1. On August 12, 2021, Respondent filed his report pursuant to Vaccine Rule 4(c) and "recommend[ed] that compensation be awarded." Resp't's Report at 1 ECF No. 22. Respondent specified that "[t]he scope of damages to be awarded is limited to [P]etitioner's GBS and its related sequelae only." *Id.* The case proceeded to damages, but the parties remain unable to agree on an amount, which consists entirely of pain and suffering. For the reasons discussed below, and after considering the entire record and argument from the parties, I find that Petitioner is entitled to a total pain and suffering award of **$180,000.00**.

### I. Procedural History

Petitioner filed his first batch of medical records, an affidavit, and a statement of completion on May 4, 2020. Pet'r's Exs. 1–15, ECF Nos. 6–7. He filed additional medical records

---

[1] This Decision will be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet**. In accordance with Vaccine Rule 18(b), a party has 14 days to identify and move to delete medical or other information that satisfies the criteria in § 300aa-12(d)(4)(B). Further, consistent with the rule requirement, a motion for redaction must include a proposed redacted Decision. If, upon review, I agree that the identified material fits within the requirements of that provision, such material will be deleted from public access.

on October 28, 2020. Pet'r's Exs. 16–17, ECF No. 13. On January 27, April 30, and May 20, 2021, Petitioner filed three separate sets of medical records. Pet'r's Exs. 19–24, ECF Nos. 17–18, 20. Respondent filed his Rule 4(c) Report on August 12, 2021, and conceded entitlement, limited to Petitioner's GBS injury. Resp't's report. I issued a Ruling on Entitlement on October 29, 2021, and the case entered the damages phase. ECF Nos. 23, 25. Petitioner filed updated medical records and a statement of completion on January 3, 2022. Pet'r's Exs. 25–29, ECF No. 27. On August 18, 2022, Petitioner filed a declaration regarding pain and suffering. Pet'r's Ex. 30, ECF No. 24. After remaining in damages discussions for over a year, Petitioner filed a motion for ruling on the record with respect to damages on April 7, 2023. Pet'r's Mot., ECF No. 42. Respondent filed his response on June 12, 2023, and Petitioner replied on June 28, 2023. Resp't's Response, ECF No. 45; Pet'r's Reply, ECF No. 46. This matter is now ripe for adjudication on the issue of damages.

## II.     Medical History

Petitioner was a 67-year-old retired police officer when he received a flu vaccine at the office of his primary care provider ("PCP"), Michael Braun, M.D., on October 30, 2018. Pet'r's Ex. 3 at 4–5. His medical history was significant for joint disease, gastroesophageal reflux disease, hypertension, and hyperlipidemia. Pet'r's Ex. 16 at 3–4. Petitioner's medical records also indicated a decades-long history of back pain and chronic hip pain. *See, e.g.*, Pet'r's Exs. 3, 5, 17.

A few days after his vaccination, on November 3 or 4, 2018, Petitioner began experiencing pain, numbness, and gait problems. *See* Pet'r's Ex. 2 at 27, 35, 39. On November 5, 2018, Petitioner presented to the emergency department ("ED") at Wilcox Memorial Hospital with leg pain, numbness, and weakness that he said began one or two days earlier. Pet'r's Ex. 13 at 2. Petitioner had a wide-based, ataxic gait. *Id.* On examination, neurologist Surendra Rao, M.D., noted hyperreflexia, but reduced ankle reflexes, and added Petitioner's "symptoms [were] consistent with [GBS] except that his reflexes [were] still intact," but "this may be because it [was] early in the course of the disease." Pet'r's Ex. 2 at 43; Pet'r's Ex. 16 at 37–40. Petitioner was admitted to the hospital. Pet'r's Ex. 16 at 7, 13, 24–25, 45.

Over the course of eight days, Petitioner had two rounds of intravenous immunoglobulin ("IVIG") treatment. *Id.* at 7. His clinical course and elevated protein in his cerebral spinal fluid was consistent with a diagnosis of GBS. Pet'r's Ex. 2 at 46; Pet'r's Ex. 17 at 17. Three days into his hospitalization, on November 8, 2018, Petitioner's overall condition worsened, and he was transferred to the intensive care unit ("ICU") as a precaution. Pet'r's Ex. 13 at 34, 43; Pet'r's Ex. 16 at 4. He had numbness in his legs and needed help transferring from the seated to standing position. Pet'r's Ex. 2 at 17. After Petitioner's second round of IVIG, however, his condition significantly improved. Pet'r's Ex. 13 at 54. When Dr. Rao evaluated Petitioner for the last time on November 14, 2018, Petitioner had symmetrical hyperreflexia, but absent ankle reflexes. *Id.* at 65. His leg weakness and gait had improved. *Id.* at 65. On November 15, 2018, after ten days in the hospital, Petitioner was transferred to inpatient rehabilitation. *Id.* at 70. Petitioner was discharged to his home on December 3, 2018, after roughly two weeks at the Rehabilitation Hospital of the Pacific. Pet'r's Ex. 4 at 2–7. He could ambulate 300 feet with forearm crutches and relied on over-the-counter pain medication. *Id.* at 7.

On December 5, 2018, Petitioner followed up with Dr. Braun. Pet'r's Ex. 3 at 2–3.

Petitioner reported residual weakness and numbness in his legs and increased back pain. *Id.* He also reported that he "fe[lt] like the low back pain [was] hindering his recovery as he [was] having sig[nificant] pain in the lower back with ambulation." *Id.* at 2. Dr. Braun prescribed prednisone and Percocet, then referred Petitioner to Hawaii Sports and Balance Center ("HSBC") for physical therapy ("PT") and advised that he follow-up with Dr. Rao. *Id.* at 3. Petitioner began PT at HSBC on December 6, 2018. Pet'r's Ex. 5 at 38–47. At the initial evaluation, the therapist noted that Petitioner had a history of chronic back and hip pain. *Id.* at 44. Petitioner attended PT regularly, and by January 16, 2018, his ability to walk had improved, but he was hindered by his back pain. *Id.* at 1–16. On January 29, 2019, Petitioner presented to orthopedic surgeon, Kenneth T. Kaan, M.D., at the Spine Care Center of Hawaii for chronic back pain that was intermittent, but severe. Pet'r's Ex. 17 at 3. Petitioner reported that his GBS required him to sit or lay down, which caused numbness, tingling, and disabling pain in his legs. *Id.* Dr. Kaan recommended conservative treatment with PT, leaving surgery as an option if his low back pain did not improve. *Id.*

Petitioner followed up with Dr. Kaan on February 26, 2019, with continued low back pain. *Id.* at 9. X-rays showed L3-L4 spondylolisthesis. *Id.* Dr. Kaan recommended an L3-L4 fusion and lumbar lordosis. *Id.* By the end of February 2019, Petitioner's physical therapist noted that Petitioner showed "improvement in gait mechanics." Pet'r's Ex. 5 at 34. Approximately three weeks later, on March 21, 2019, Petitioner presented to Dr. Braun reporting continued weakness. Pet'r's Ex. 8 at 7–8. On examination, Dr. Braun observed that Petitioner could walk slowly without assistance. *Id.* at 7. Dr. Braun's assessment was persistent weakness after flu vaccination and GBS, as well as recurrent urinary tract infections ("UTIs"). *Id.*

Petitioner next saw Dr. Braun on May 13, 2019, for a preoperation physical in anticipation of his upcoming lumbar spine surgery. *Id.* at 3–4. Petitioner reported recurrent UTIs, and persistent paresthesia and back pain that radiated down both his legs. *Id.* Dr. Braun noted that he was able to ambulate independently but had a slow gait, and had "gradually improving[,] but residual weakness after having [GBS] in November 2018." *Id.* On May 15, 2019, Petitioner underwent lumbar spine surgery "for low back pain, numbness and tingling in his lower extremities bilaterally." Pet'r's Ex. 22 at 8. He was prescribed Oxycodone and Celebrex and was discharged on May 18, 2019. *Id.* at 8–9. Petitioner followed up with Dr. Braun less than one week later, on May 23, 2019, reporting that his balance and leg weakness had improved since surgery. Pet'r's Ex. 8 at 2–3. He had postoperative pain that was reportedly adequately controlled with prescription medication. *Id.* Dr. Braun observed Petitioner was "[a]mbulating slowly but independently." *Id.* at 2.

Around one month later, on June 25, 2019, Petitioner saw Dr. Kaan. Pet'r's Ex. 17 at 14. He reported that his back pain had improved, but he had numbness in his legs. *Id.* Dr. Kaan opined that Petitioner "apparently need[ed] a total hip [replacement] and ha[d] difficulty with ambulating." *Id.* Petitioner presented to orthopedic surgeon Derek Johnson, D.O., on July 10, 2019. Pet'r's Ex. 16 at 81. Petitioner reported that on January 8, 2019, "he was stepping off of a curb and his hip gave out." *Id.* Petitioner reported two other similar episodes and described "deep aching pain in the hip which [was] aggravated by prolonged standing and walking." *Id.* He noted that PT had not helped. *Id.* Dr. Johnson recommended that Petitioner undergo hip replacement surgery. *Id.* at 84. Petitioner underwent a left total hip arthroplasty on August 5, 2019. Pet'r's Ex. 9 at 66; Pet'r's Ex. 16 at 86. The next day, he was able to ambulate with the help of a rolling-

3

walker and was discharged. Pet'r's Ex. 9 at 66. Petitioner presented for an initial PT evaluation on August 9, 2019. Pet'r's Ex. 12 at 32. Petitioner described his lower back as "a little better than it was," but it was still moderate to severe, especially when bending. *Id.* He also reported ongoing numbness and weakness. *Id.* The therapist thought that Petitioner "would benefit from PT," and recommended two sessions per week for six weeks. *Id.* at 33, 38. Petitioner followed up with Dr. Braun on September 23, 2019, reporting persistent paresthesia, numbness, and weakness in both legs, as well as urinary retention. Pet'r's Ex. 11 at 4. A PT record dated September 27, 2019, noted Petitioner's statement "that today [was] the best his low back ha[d] felt so far." Pet'r's Ex. 12 at 80.

Petitioner presented to urgent care in late October 2019, reporting dysuria, testicular pain and swelling, and frequent UTIs. Pet'r's Ex. 11 at 2; Pet'r's Ex. 14 at 3. He reported that he had frequent UTIs since his flu vaccine and GBS. Pet'r's Ex. 14 at 3. He was prescribed medication for a bacterial infection and told to present to the ED if he did not improve within 24 hours. *Id.* at 4. A few days later, on November 5, 2019, Petitioner returned to Dr. Rao for a follow-up. Pet'r's Ex. 20 at 15. Dr. Rao observed Petitioner to have normal strength and that his lower back pain had significantly improved after surgery. *Id.* at 21. The primary diagnosis was "[s]pinal stenosis of lumbar region with neurogenic claudication." *Id.* at 15. He was prescribed Flexeril and Toradol and instructed to follow up with Dr. Kaan. *Id.* at 21, 24, 25. Petitioner returned to Dr. Kaan on November 12, 2019. Pet'r's Ex. 17 at 19. He reported that he still had some back pain, but his leg pain had resolved. *Id.* The plan was for Petitioner to continue with PT and follow up in three months. *Id.* A recertification note from PT on November 19, 2019, indicated that during a trip to Greece a few weeks prior, Petitioner was able to walk in the airport, "but walking long distances for multiple days in a row was very taxing on his endurance and low back." Pet'r's Ex. 12 at 49. In a progress note dated December 24, 2019, the physical therapist wrote that Petitioner was noticing improvement in his mobility, but he thought that his lower back pain and GBS were impairing his progress. *Id.* at 42. Petitioner returned to Dr. Braun on May 21, 2020, reporting that his leg weakness had improved, and he could ambulate independently. Pet'r's Ex. 18 at 2. Petitioner's most recently filed medical records indicated that he continued to experience hip problems throughout 2020 and into 2021 and that he continued to attend PT. *See* Pet'r's Ex. 12 at 58–78; Pet'r's Exs. 23–24.

### III.   Petitioner's Statements

#### a. Affidavit

Petitioner filed an affidavit with his first batch of medical records on May 4, 2020. Pet'r's Ex. 6. He noted that prior to his vaccination he "was healthy and independent with all of [his] functional abilities." *Id.* at ¶4. Petitioner noted that he had retired from a very active career as a police officer and had relocated with his wife to Hawaii to enjoy a life of surfing, hiking, and bike riding. *Id.* In particular, Petitioner described his life-long love for surfing and his routine of surfing "three to four times a week at a nearby beach just five minutes from [his] home – each session last[ing] two to three hours." *Id.* at ¶ 5.

Initially, Petitioner thought his post-vaccination pain was due to a pinched nerve and did not seek treatment. *Id.* at ¶ 7. However, he "became concerned" when his online research suggested a possible stroke, and he "told [his] wife that [they] need[ed] to go [to] the hospital." *Id.* at ¶ 9. At

the hospital, Petitioner was diagnosed with GBS and stated that during his ICU stay, he "was basically paralyzed from [his] waist down." *Id.* at ¶ 11. He described himself as "very anxious" about his potential for recovery. *Id.*

During Petitioner's rehabilitation, he "suffer[ed] paralysis for one month – mostly bedbound and in a wheelchair." *Id.* at ¶ 15. Even after regaining his mobility, Petitioner developed "severe incontinence" and continued to use catheters "three times a day at home." *Id.* at ¶ 18. He also noted that he "developed severe lower back pain, which a specialist determined was a result from being bedridden for weeks" while hospitalized. *Id.* at ¶ 16. Petitioner attributed his need for back and hip replacement surgeries in 2019 to his GBS immobility. *Id.* at ¶ 16-17.

Currently, he suffers from "numbness in both of [his] legs from [his] feet up through [his] thighs and into [his] lower back." *Id.* at ¶ 16. Petitioner does not require an assistive walking device, but he is unsteady on his feet and noted that "[s]tanding on one leg is virtually impossible." *Id.* at ¶ 18. He is also unable to sleep in the same bed as his wife due to "nocturnal leg spasms that disrupt [his] sleep and hers." *Id.* at ¶ 19. Petitioner's wife has assumed responsibility for many household activities that used to be Petitioner's responsibility, such as taking out the trash and cooking. *Id.* at ¶ 20. They are unable to enjoy the recreational activities together that precipitated their move to Hawaii. *Id.* at ¶ 21.

### b. Damages Declaration

Petitioner filed a statement he described as an "update regarding [his] current physical status" during the damages phase of this litigation. Pet'r's Ex. 30 at ¶ 1. He stated that he has "experienced virtually little to no change in [his] balance and mobility impairments." *Id.* Petitioner cannot run and likens his walking gait as "tight and rigid," as if intoxicated. *Id.* Even walking at a slow pace, Petitioner is exhausted after short distances and experiences constant pain except when sitting or lying down. *Id.* at ¶ 2. After fifty years of surfing, Petitioner is "unable to participate in any form of water or athletic activity." *Id.* at ¶ 5. He must watch from the beach and is now extremely devastated by his inability to engage in the types of extreme physical activity that have dominated his life, (bull-riding, motocross, semi-pro football). *Id.* at ¶ 10. Petitioner noted that he and his wife are considering moving back to the mainland, due to the high cost of Hawaii living and his inability to fully enjoy island life. *Id.* at ¶ 13.

### IV. Arguments Regarding Damages

#### a. Petitioner's Argument

In Petitioner's motion for damages, he requested an award for past pain and suffering in the amount of $200,000.00.[2] Pet'r's Mot. at 31. Petitioner focused on several factors for consideration, including his ten-day hospitalization, eight rounds of IVIG, 18 days of inpatient rehabilitation, two months of PT, daily catheter use, and inability to enjoy his retirement. *Id.* at 22–29. He compiled a chart and compared his circumstances to other petitioners in the Program who were awarded pain and suffering amounts of approximately $180,000.00. *Id.* at 22; *see Devlin v. Sec'y of Health & Hum. Servs.*, No. 19-191V, 2020 WL 5512505 (Fed. Cl. Spec. Mstr.

---

[2] Petitioner did not request an award of future pain and suffering.

5

August 7, 2020) (awarding $180,000.00 in past pain and suffering); *Fedewa v. Sec'y of Health & Hum. Servs.*, No. 17-1808V, 2020 WL 1915138 (Fed. Cl. Spec. Mstr. March 26, 2020) (awarding $180,000.00 in actual pain and suffering); *Presley v. Sec'y of Health & Hum. Servs.*, No. 17-1888V, 2020 WL 1898856 (Fed. Cl. Spec. Mstr. March 23, 2020) (awarding $180,000.00 for actual pain and suffering); *Dillenbeck v. Sec'y of Health & Hum. Servs.*, No. 17-428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019) (awarding $170,000.00 in past pain and suffering and $10,857.15 for future pain and suffering); *Johnson v. Sec'y of Health & Hum. Servs.*, No. 16-1356V (awarding $180,000.00 for actual pain and suffering). Petitioner also highlighted his career in public service and active lifestyle prior to vaccination. Pet'r's Mot. at 29–30.

In his reply to Respondent, Petitioner argued that "the records support the fact that Petitioner's GBS exacerbated his hip and back pain to the point of needing surgery. Additionally, the records repeatedly reference his ongoing GBS symptoms – separate and apart from any residual symptoms from his hip and back surgery." Pet'r's Reply at 1. Petitioner noted that "[h]e did not require any treatment for his back pain and did not report having any additional pain in the [eight] months leading up to his GBS diagnosis." *Id.* at 2. Prior to his vaccination, Petitioner stated that he was able "to engage in his daily activities including surfing three to four times per week." *Id.* at 3. The medical records indicated that his lower back pain "increased during his recent hospitalization." *Id.* at 3 (citing Pet'r's Ex. 3 at 2–3). Petitioner argued that "but for his vaccine injury, Petitioner's low back pain would not have risen to the level of a need for surgery at [that] time." *Id.* He further noted in a January 29, 2019 record that Petitioner "had a bout of [GBS] where he required sitting and lying down and he had lower extremity paralysis. As a result, this pain got much worse and is now disabling." *Id.* at 4 (citing Pet'r's Ex. 17 at 3). Petitioner reiterated that he suffers from gait urinary retention issues as a direct result of his GBS. *Id.* at 5, 8.

Petitioner detailed his trip to Italy with his wife in 2019 to provide further context to the effect of his injuries on his life. *Id.* at 6. He disputed the PT note that incorrectly stated his trip was to Greece and mischaracterized his mobility at the airport. *Id.* He noted that he "required wheelchair assistance through the airport." *Id.* He was unable to participate in "[m]any of the prepaid tours and hikes," due to "walking challenges that Petitioner could not overcome due to his gait disturbances and ongoing pain." *Id.* His trip was further interrupted by "a painful UTI with fever, that made him so uncomfortable he did not leave his room for the final [five] days that they were in Italy." *Id.* Petitioner did not suffer from "urinary retention issues or frequent UTIs prior to his GBS onset." *Id.*

### b. Respondent's Argument

Respondent included in his response a case-specific analysis with respect to pain and suffering. Resp't's Response at 10–13. He noted that GBS cases can "run the spectrum from cases involving severe sequelae requiring life care plans to . . . complete[] recover[y] shortly after the six-month minimum duration of symptomatology required to qualify for compensation under the Act." *Id.* at 10. On comparison, Petitioner "demonstrate[s] a somewhat less severe course of GBS than often seen in the Program, comparatively speaking." *Id.* Respondent did not characterize Petitioner's hospitalization and inpatient rehabilitation as lengthy and noted that Petitioner "never lost the ability to walk." *Id.* Petitioner's course of treatment was described as "fairly typical, primarily involving IVIG therapy and PT, [without] any complication." *Id.* Respondent argued

that "[b]y six and a half months after his vaccination, petitioner's chronic orthopedic issues overshadowed petitioner's GBS residua." *Id.* Consequently, Respondent submitted that "an award of $130,000.00 for pain and suffering is just and fair compensation." *Id.* at 11.

With respect to the cases that Petitioner cited, Respondent noted that none of them had received the $200,000.00 amount requested in this case. *Id.* He identified distinguishing features such as "more extensive treatment," the "inability to work for months," and "objective evidence of ongoing neurologic deficits," as evidence that "[P]etitioner's reliance on these cases is misplaced." *Id.* at 13. Instead, Respondent cited a case where the petitioner had other relevant chronic conditions and was able to "ambulate without assistance" seven months post-symptom onset. *Castellanos v. Sec'y of Health & Hum. Servs.*, No. 19-1710V, 2022 WL 1482497 (Fed. Cl. Spec. Mstr. Mar. 30, 2022) (awarding $125,000.00 for actual pain and suffering). Respondent cited a second case wherein the petitioner was hospitalized and following inpatient rehabilitation, suffered from ambulation difficulties requiring a wheelchair or wheeled walker before improving to "nearly full strength within three months of initial presentation." *Weil v. Sec'y of Health & Hum. Servs.*, No. 21-831V, 2023 WL 1778281 (Fed. Cl. Spec. Mstr. Jan. 6, 2023) (awarding $140,000.00 in actual pain and suffering).

## V.     Legal Standard

Compensation awarded pursuant to the Vaccine Act may include an award "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, . . . not to exceed $250,000." § 15(a)(4). There is no precise formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("[T]he assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated and remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995)).

A special master may also look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in each case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.,* 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). And, of course, a special master may rely on his or her own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 579 (2013).

In *Graves*, Judge Merrow rejected the special master's approach of awarding

compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap, criticizing this as constituting "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves*, 109 Fed. Cl. at 590. Instead, he found that pain and suffering should be assessed by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program, applying the statutory cap only thereafter. *Id.* at 595.

## VI. Compensation Factors

### a. Awareness of Suffering

In this case, neither party has raised, and the record does not indicate that Petitioner's awareness of suffering is in dispute. Based on the evidence and circumstances of this case, I find that Petitioner had full awareness of his suffering.

### b. Severity and Duration of Pain and Suffering

Petitioner asserts that his injury is more severe than other Program cases, wherein the petitioners received awards approximating $180,00.00. Regarding severity, during the course of his treatment, Petitioner underwent a ten-day hospitalization, eight rounds of IVIG, and 18 days of inpatient rehabilitation. This degree of acute treatment is certainly comparable to the cases that Petitioner has identified. Respondent's assertion that Petitioner never lost the ability to walk is a technicality that ignores Petitioner's need for forearm crutches to walk 300 feet one-month post vaccination. Petitioner also presented unrebutted evidence that in 2019, he required wheelchair assistance to navigate the airport. Petitioner also engaged in outpatient rehabilitation but continues to struggle with gait issues and self-catharizes two to three times per day.

Despite Petitioner's timely and comprehensive treatment, he was unable to do many activities he previously enjoyed, because he ultimately lost much of his mobility and energy. Respondent argues that Petitioner's course was "somewhat less severe" when compared to other cases that Petitioner identified. Resp't's Resp. at 10. Of note, Petitioner was similar in age at the time of vaccination to these other petitioners. However, the nature of Petitioner's career allowed him to retire fairly young. It also required some degree of fitness, and Petitioner made substantial life changes during his retirement geared toward active recreation. His pain and suffering should not be mitigated, because he did not suffer from the "[in]ability to work for months." *Id.* at 12. That type of loss is best considered pursuant to lost wages. Instead, Petitioner lost the ability to engage in the activities he had worked so hard to enjoy. This is an appropriate measure of pain and suffering.

Respondent further argues that Petitioner's relevant injury spanned a much shorter timeframe because Petitioner's continuing mobility issues are the result of pre-existing "chronic orthopedic issues." *Id.* at 10. Respondent also maintains that despite Petitioner's claims of wheelchair use, he "never lost the ability to walk." *Id.* Respondent does not associate Petitioner's back and hip surgeries in 2019 with his GBS. This argument, however, is inconsistent with the opinions of Petitioner's treaters. In May 2019, Dr. Braun noted that Petitioner was mobile but had a slow gait and had "gradually improved but [with] residual weakness after having [GBS] in

November 2018." Pet'r's Ex. 8 at 5. Petitioner's medical records consistently document mobility issues and his gradual improvement, but continued complaints of difficulty balancing and walking. Petitioner has presented preponderant evidence that any pre-existing condition that he has was controlled and did not affect his mobility prior to his vaccination. His treaters noted a significant worsening post vaccination, and there is preponderant evidence that Petitioner's fall on January 8, 2019, was a direct result of his gait issues. Likewise, any surgeries or treatment required thereafter to treat injuries resulting from the fall would also be directly related to his gait limitations, although perhaps not singularly causal.

## VII. Conclusion

Respondent is correct that Petitioner has not presented evidence consistent with some of the most severe consequences of GBS. Due to the individual circumstances and facts of each case, I have not relied on any single decision or used any other claim as the basis for an award ceiling or floor. However, there is preponderant evidence that Petitioner has not experienced a complete recovery, and his GBS will have lasting effects on his health. Petitioner has established that his case is analogous to those that he has cited in his filings.

After a careful and comprehensive review of the facts of this case and in consideration of all the arguments presented by both parties along with the relevant caselaw, I find that **$180,000.00** in compensation for pain and suffering is reasonable in this case. This amount represents compensation for all damages that would be available under § 15(a). The Clerk of Court is directed to enter judgment in accordance with this Decision.[3]

**IT IS SO ORDERED.**

s/Herbrina D. S. Young
Herbrina D. S. Young
Special Master

---

[3] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.